## BENNO WILLIAMS v. THE STATE.

### No. 192.   Decided December 22, 1909.

**Assault to Murder—Sufficiency of the Evidence—Intent to Kill.**

Where, upon trial for assault with intent to murder, the evidence showed that the defendant prepared himself with rocks, and sought out the injured party, and in the course of his attack on him said that he would kill him, and inflicted serious wounds upon said injured party, there was sufficient evidence of a specific intent to kill on the part of the defendant, and the judgment convicting him of assault with intent to murder was authorized by the evidence.

Appeal from the District Court of Fayette. Tried below before the Hon. L. W. Moore.

Appeal from a conviction of assault with intent to murder; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*John T. Duncan,* for appellant.

*F. J. McCord,* Assistant Attorney-General, for the State.

RAMSEY, JUDGE.—Appellant was convicted of assault to murder, his punishment being assessed at two years confinement in the penitentiary.

It is contended the evidence is not sufficient to support the conviction for assault with intent to murder. Appellant was a negro and Fritz Kratz was a white man. Appellant had been working for Kratz as a farm hand, his term of service being by the month. He had been living on his employer's place and working for him from the first of January, 1908. The first trouble seems to have occurred on Saturday before the trouble on Monday morning. On Saturday appellant asked Kratz for $4.25, which he claimed his employer owed him, but Kratz denied owing him, yet let him have the sum of $2. Kratz testified, in this connection, that appellant was working for him on his farm. That he quit working on Saturday night before the first of June. That on Saturday appellant came to him and wanted $4.25. He says, "I told him he was ahead and that I would give him $2." When he started to give appellant the money appellant said, "God-damn you and your money." "I told him that he must get off the place as I didn't want him around me any more." On the following Monday morning about sunup this witness says appellant came to him and asked him if he wanted him to plow and he told him no. Appellant then asked Kratz if he wanted Holly, who is a young brother of appellant's wife, a boy 14 years of age. Appellant then went home, and the next time witness saw him was down in the field some three or four hundred yards from the house. Kratz and his son were down there. Witness was plowing, headed south when he first noticed appellant coming across the field; that he reached the turn row just a little before appellant did. He says just before he reached the end of the row and while he was behind the team and cultivator, appellant said to him, "I want that money." Witness again denied owing him any money and turned his team and plowed on towards the south. Just about that time appellant struck him, and said, "I will kill you, you son-of-a-bitch." At the time appellant struck him the witness had gone about twenty-five steps down the row after turning around. He said the first lick knocked him down. He then ran and got behind his team so he would have them between himself and appellant. That appellant then struck him on the head. That appellant attacked him by throwing rocks at him. He says appellant had the rocks in his pocket; he saw him get one from his hip pocket, and the next one from his jumper pocket. He said appellant said something else, but he did not remember what it was, "as the lick on the head had made me minus and I could not remember what it was he said after that." This witness said there were no rocks on the ground at this place at all. The witness then ran off towards the house apparently after his gun

and appellant went away. The little 12 year old son of the injured party testified that he was down there when appellant came; that his father was plowing, and he, the boy, was planting peas. Appellant wanted some money, and his father told him he did not owe him any money, and the negro commenced throwing rocks at his father. This boy says he was three or four yards from them or something like that. The negro pulled rocks out of his pocket that he threw at his father. The first rock struck his father in the back and knocked him down, and the next rock struck him on the head. That the negro said while he was throwing, "I am going to kill you." A negro named Scott came down there immediately after this transaction, and appellant ran off through the field, and his father went to the house. Dr. Verdrey says he saw Kratz, the injured party in the town of Winchester the same day after the difficulty in the morning. He says it was a quiet day in the little village, when he saw a man standing in the street with a white cloth over his head, and he approached him and asked him who he wanted to see. The party just stared at him and made no reply. Shortly after that he was called to see the same party, and found him in an unconscious condition. That he had a convulsion, which he said was due to a partial contusion of the brain, which was brought about by the wound on the head. He took three stitches in the wound to relieve the party. He says the wound was about an inch and a half long and went to the bone; it injured the bone but did not break it. The evidence further shows that a bruise in Kratz's back was as large as his hand and that the blow, caused by a rock, fractured or broke two ribs. The rocks with which the blow was inflicted were described as being flint rocks as large as a man's hand. One of the physicians expressed surprise that the wound on the head had not caused death. The facts show further, that some months afterwards a little piece of the bone was taken out that had been splintered off from part of the skull. The negro Scott, who was a witness to the transaction in the field between Kratz and appellant, testified that he had rented eighteen acres of land from Mr. Kratz, and was working it, and that he took Kratz to town in a buggy after he was hurt the same day. That he saw the trouble. He says the parties were throwing at each other; that Kratz had something in his hand, but he thought it was a monkey-wrench that Kratz had taken off the cultivator. He says on the way to town Kratz talked with him, and said appellant claimed two dollars of him, and he did not owe it and was not going to pay it, and he further stated that this was the matter that brought up the trouble. The witness further stated that if he had had his gun he would have killed him. They took the gun to town with them in the buggy. Appellant testified that he was 26 years of age, had been raised in that neighborhood, lived there

all his life; that he had an agreement with the witness Kratz that he was to receive $14 one month and $15 the next until his term of service was out; that he worked for Kratz from the first of January to the first of June or about the first of June. That he had trouble with Mr. Kratz on Saturday before this trouble occurred on Monday. That he asked Mr. Kratz for $2 and informed him that the balance of the money was not due until Monday. That he remained away from Saturday evening until Monday morning; when he came to the field to go to work, he was informed that Mr. Kratz had been to his house and left word for him to hurry up to the field. He says Kratz's little boy was chopping cotton and defendant was chopping with him, and the boy informed him that his father wanted to see him. He left his hoe and went down to where Mr. Kratz was plowing to see him. He was about the middle of the field, and they walked along together after he reached Mr. Kratz. Kratz asked him what made him so late, and appellant told him that he had overslept himself. Mr. Kratz then told him he wanted him to leave, and he asked Mr. Kratz to pay him up and he would go. That Kratz then called him a black son-of-a-bitch and said he did not want him there at all, and said he was not going to pay him anything. Appellant again requested him to pay him his money, and Kratz struck him with a monkey-wrench, and he, appellant, got some rocks; that he got the rocks off the ground between himself and Mr. Kratz; that he did not take any rocks down there with him; that he was not expecting any trouble, because he had never had any trouble. He says when Kratz struck him with the wrench he said he was going to kill him. Appellant then threw at him with the rocks that he had picked up. He said he threw twice at Mr. Kratz and Mr. Kratz threw twice at him. When he threw the second rock Kratz was approaching him and going into his pocket, and he said he then ran off. This is a sufficient statement of the case.

The only question insisted upon as ground for reversal is a want of sufficient evidence to show that the assault was made with intent to murder. In determining this question we must, of course, look to the entire record, and if there is any evidence in the record from which the jury might have concluded that the assault made was with the specific intent to commit murder, then the conviction must be sustained. The evidence shows beyond doubt or controversy a grievance on the part of appellant, malice and ill-will. If the State's testimony is to be believed, after his discharge, and when he had no longer any right upon the premises, he came to where Kratz was plowing and made a demand on him for money, which was not due him; that being refused the sum demanded, while Kratz's back was turned to him he made upon him a most violent assault. The evidence of both Kratz and his son shows that there

were no rocks on the ground at the place where the father was struck; that appellant, in anticipation of making the assault, had deliberately armed himself with at least two, and probably more, rocks, which are described as being as large as a man's hand, and, in a short distance of Kratz, struck him twice. The first blow was in the back, making a bruise as large as a man's hand and breaking, or fracturing, two ribs. This blow knocked Kratz partly down and thereupon he started to run. Appellant struck him again with one of these rocks on the head, causing a partial concussion of the brain, fracturing the skull, causing a wound on same about an inch or an inch and a half long, going to the bone and injuring the bone of his skull. It is disclosed further that this wound caused such injury that later there was cut from same a piece of bone about three quarters of an inch long, about a half inch wide and as thick as a dime; that the piece of bone was much larger when it was first broken, or knocked off, as it had partially dissolved by nature. The rule is well settled that the offense of assault with intent to murder is not made out where the evidence fails to show that the intended offense would have been murder had death resulted from the assault. State v. Killough, 32 Texas, 74. It is not necessary, however, that if death resulted from the assault, the murder would have been murder of the first degree. The character of the weapon is not an inevitable test. If not a deadly weapon, or if not used in a deadly manner, the intention to kill may be, and indeed must be, established by other facts. Hatton v. State, 31 Texas Crim. Rep., 586. In determining the guilt ·of appellant in this case, we find at least these facts concurring: First, preparation in preparing himself with rocks; second, the intent to kill as discovered and disclosed by his statement, twice made to Kratz at the time of the assault, that he intended to kill him; third, the serious character of the wounds. The court instructed the jury as to what was a deadly weapon, and whether the assault was committed with a deadly weapon, and both in his general charge and in a special charge whether the assault was made with the specific intent to kill. The verdict of the jury of necessity affirms that the weapon was a deadly one, and that the intent to kill existed. We think, in view of the finding of the jury and the action of the court below, and in the light of all the circumstances, that it can not be said that the verdict of the jury is without evidence to support it.

So believing it results that the judgment of conviction should be affirmed, which is now done.

*Affirmed.*